# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4656 | **DATE** | 8/27/2004 |
| **CASE TITLE** | Tovar vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Before the court is Defendant's Motion for Summary Judgment. Defendant's motion is granted, terminating this action. It is so ordered.

*Charles R. Norgle*

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | number of notices |
| Notices mailed by judge's staff. | |
| Notified counsel by telephone. | AUG 3 1 2004 date docketed |
| Docketing to mail notices. | |
| Mail AO 450 form. | docketing deputy initials |
| Copy to judge/magistrate judge. | |
| courtroom deputy's initials | date mailed notice |

Document Number

53

U.S. DISTRICT COURT
CLERK

2004 AUG 30 PM 5: 25

Date/time received in central Clerk's Office

mailing deputy initials

CAROLYN TOVAR,       )
                               )
        Plaintiff,         )
                               )     No. 02 C 4656
vs.                         )     Judge Charles R. Norgle
                               )
CITY OF CHICAGO,       )
                               )
        Defendant.      )

**DOCKETED**

**AUG 3 1 2004**

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge.

Plaintiff Carolyn Tovar brings this action for race and gender discrimination pursuant to Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII") against her employer the City of Chicago ("City"). The City moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the City's motion is granted.

## I. BACKGROUND

### A. Facts

Carolyn Tovar (female, African-American) joined the Chicago Police Department ("CPD") as a police officer in June 1992. In 1996, the City placed Tovar on limited-duty status due to medical problems associated with her back. While on limited-duty, the City assigned Tovar to CPD's Alternate Response Section ("ARS"). The ARS is a component of the Office of Emergency Communications ("OEC") and is responsible for answering and processing non-emergency telephone calls from citizens who utilize the City's 311 Non-Emergency Response System. Tovar's assignment with ARS ended in July 2003, when she was transferred to the Record Services Division.

*53*

The command structure of ARS is as follows: the Deputy Director of OEC, Non-Emergency Services; the Commander of Communications Division-Administration; and the ARS Project Manager. Morris Steward (male, African-American) served as Deputy Director from approximately 2000 to 2003, when he retired. Lieutenant Robert Weisskopf (male, Caucasian) has served as the Commanding Officer since Steward's departure. Sergeant William Bratek (male, Caucasian) served as Project Manager for all times relevant to this case. To deal with the day-to-day operations, the ARS command staff assigns additional supervisory personnel to the unit. Sergeant John Mahon (male, Caucasian) was assigned to ARS in 1996. Since 1997, Sergeant Mahon has served primarily as the second watch supervisor. In addition to Sergeant Mahon, various other sergeants work in ARS on the second watch.

ARS has several different positions for police officers. The majority of police officers assigned to ARS fill the position of call taker. A call taker is responsible for accepting and dispatching calls that come through the police non-emergency line, conducting telephonic investigations, and completing case reports or other police reports if necessary. In addition to call taker, there are several administrative positions available for police officers assigned to ARS. These administrative positions include one unit secretary, one watch secretary, as many as three time keeper positions, as many as three tape room positions, and two administrative desk ("Ad Desk") positions. The unit secretary reports directly to the commanding officer in charge of ARS. The watch secretary completes time and attendance sheets for the watch to which they are assigned, as well as assisting with other administrative duties. The watch secretary also completes a report based on the activity of the previous watch. An officer assigned to the Ad Desk performs a variety of tasks including tracing unlisted numbers, doing computer entry for

2

stolen automobiles and license plates, interacting with the police districts, and compiling statistics from the various watches.

During his tenure with ARS, Sergeant Mahon did not select any officers for the time keeper or tape room positions. Only Sergeant Bratek and Deputy Director Steward assigned police officers to these positions. Sergeant Mahon, along with other supervisors assigned to ARS, did have the authority to select police officers for the watch secretary and Ad Desk positions. The number of officers assigned to the second watch in ARS has ranged from a low of 69 to a high of 112 during Sergeant Mahon's tenure in ARS. In addition to staffing the positions within ARS, the unit is also required to staff security positions at the City's 911 Center ("911 Security Detail"). Officers are selected from each watch to serve on the 911 Security Detail. Four of those positions are on the second watch.

While assigned to ARS, Tovar worked primarily as a call taker on the second watch. Tovar received satisfactory performance ratings throughout her employment; however, on two occasions her proficiency rating were lowered, though not to a level that would affect her employment. In addition to working as a call taker, Tovar received training in the watch secretary and Ad Desk positions. On various occasions, Tovar asked to be assigned to work in these administrative positions; however, these requests were often refused.

In the spring of 2001, Tovar went on maternity leave. During this time, Sergeant Mahon was assigned to investigate a CR number in which a citizen accused Tovar of inappropriate conduct. A CR is a complaint filed against a department member which alleges a violation of CPD rules or regulations. As part of his investigation, Sergeant Mahon was required to interview Tovar. Sergeant Mahon telephoned Tovar at home and requested that she come into the station. After Tovar explained that she was placed on bed rest by her doctor for

3

complications associated with her pregnancy, Sergeant Mahon informed her that she needed to change her medical roll status.

Tovar returned from maternity leave on August 6, 2001. Upon return, Tovar was not assigned to work any administrative position within ARS. In September 2001, Tovar requested to work on the 911 Security Detail. At that time, she did not know whether there were any available positions. Tovar's request was denied.

On November 7, 2001, Tovar filed a CR accusing Sergeant Mahon of race and gender discrimination and harassment. Tovar's CR stated that she believed Sergeant Mahon was discriminating against her because she was an African-American female. Specifically, Tovar complained that Sergeant Mahon's decisions to not allow her to work in administrative positions within ARS and to deny her assignment to the 911 Security Detail were based upon her race and gender. Additionally, Tovar also complained of Sergeant Mahon's conduct toward her while on maternity leave.

**B. Procedural Framework**

On November 19, 2001, Tovar filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated against on the basis of her race and gender, as well as retaliated against for filing an internal complaint of discrimination. The EEOC issued Tovar a Notice of Right to Sue letter on March 29, 2002. On June 28, 2002, Tovar then filed this present suit, within the 90 day period mandated by 42 U.S.C. § 2000e-16(c).

Tovar filed a Second Amended Complaint on May 6, 2003, alleging that she was discriminated against on the basis of her gender and race, as well as retaliated against for filing an internal complaint of discrimination, in violation of Title VII of the Civil Rights Act of 1964,

4

42 U.S.C. § 2000e *et seq.* The City responded with the instant motion for summary judgment, which is fully briefed and before the court.

## II. STANDARD OF DECISION

### A. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden to prove that no genuine issue of material fact exists. See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Once the moving party shows that there is no genuine issue of material fact, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party cannot rest on the pleadings alone, but must identify specific facts that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). When the defendant moves for summary judgment, the court must view the record and all inferences in a light most favorable to the plaintiff. See Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the plaintiff's favor must be drawn from specific facts identified in the record that support the plaintiff's position. See Waldridge v.

American Hoechst Corp., 24 F.3d 918, 922-23 (7th Cir. 1994). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. and Medical Center, 328 F.3d 890, 893-94 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

## B. Northern District of Illinois Local Rule 56.1

The parties must also comply with Northern District of Illinois Local Rule 56.1, Motions for Summary Judgment. The purpose of Local Rule 56.1 is to assist the court in identifying undisputed and disputed facts in order to determine the need for a trial. Local Rule 56.1 is designed to conserve judicial time and resources. See Bordelon v. Chicago School Reform Bd. of Trustees, 233 F.3d 524, 527 (7th Cir. 2000) (stating that "[t]hese rules assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence" (citation omitted)); Waldridge, 24 F.3d at 922 (stating that the courts are not "obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions"). The importance of complying with Local Rule 56.1 has been the subject of so many opinions of the United States District Court for the Northern District of Illinois and the Seventh Circuit that further elaboration is not required. See, e.g., Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003); Malec v. Sanford, 191 F.R.D. 581, 582-87 (N.D. Ill. 2000). Given the importance of Local Rule 56.1, the Seventh Circuit has consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment. See, e.g., Waldridge, 24 F.3d at 922 (collecting cases).

Compliance with Local Rule 56.1 requires "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment

as a matter of law." Local Rule 56.1(a)(3). The statement of material facts is comprised of "short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Local Rule 56.1(a). The non-movant is correspondingly obligated to submit, "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon...." Local Rule 56.1(b)(3)(A). The non-moving party is also required to file a material statement of additional facts and the moving party is required to respond in a likewise fashion. See Local Rule 56.1(a) & (b)(3)(B).

The court will deem any fact admitted in the opponent's statement of facts unless the fact is properly denied by the opposing party. See Local Rule 56.1(a) & (b)(3)(B); see also McGuire v. United Parcel Service, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission."). A denial is improper if the denial is not accompanied by specific references to admissible evidence or at least evidence that represents admissible evidence. See McGuire, 152 F.3d at 675; Malec, 191 F.R.D. at 585; see also Jankovich v. Exelon Corp., 2003 WL 260714, at *5 (N.D. Ill. Jan. 31, 2003) (Kocoras, C.J.) (indicating that evasive denials are improper and thus the contested fact is deemed to be admitted pursuant to Local Rule 56.1).

In the instant case, Tovar submitted a response to the City's Local Rule 56.1(a)(3) statement of material facts. The City devotes a substantial amount of its reply brief in support of the motion for summary judgment pointing out all of the deficiencies contained in Tovar's Local Rule 56.1(b)(3)(A) response. For example, Tovar denies numerous facts contained in the City's Local Rule 56.1(a)(3) statement without properly supporting those denials by reference to the

record, or additionally, by referencing a fact that does not refute the fact submitted by the City. See, e.g., Pl.'s LR 56.1(b)(3)(A) ¶¶ 14, 19, 21, 23, 26-27, 31, 38, 40, 47, 54-64, 69-73, 81-82, 88, 94-95. Tovar's 56.1(b)(3)(B) statement of additional facts is similarly not in compliance with Local Rule 56.1. It bears emphasis that Local Rule 56.1 was created to assist the court by relieving a court from the necessity of sifting through the record in search of genuinely disputed material facts and to prevent a plaintiff from progressing to trial by creating confusion regarding the pertinent facts and the evidence. Local Rule 56.1 requires Tovar to come forth with specific evidence to support any of her denials and thus show that any disputes are genuine, and the failure to do so results in the City's statement being admitted. See Local Rule 56.1. Therefore, the court shall take Tovar's 56.1(b)(3)(A) response as it was submitted and shall treat the numbered responses as they are written and shall deem any facts admitted as is appropriate under Local Rule 56.1.

## III. DISCUSSION

Tovar alleges three theories of liability under Title VII: (1) she was subjected to various discrete acts of discrimination based on her race and gender; (2) she was retaliated against for complaining about the discriminatory conduct; and (3) she was subjected to a racially hostile work environment. The court will address each of these claims separately.

### A. Discrete Acts of Discrimination

Tovar alleges several discrete acts of discrimination which fall within the 300-day limitation period. Specifically, Tovar alleges that the following constitute adverse employment actions she suffered based upon her race and/or gender: (1) she was not placed in any administrative positions within ARS; (2) she was denied a transfer to the 911 Security Detail; (3) she received lower proficiency ratings; and (4) she was called at home while on maternity leave.

To prove race or gender discrimination, Tovar must present either direct or indirect evidence of her claims. See Krchnavy v. Limagrain Genetics Corp., 294 F.3d 871, 875 (7th Cir. 2002); see also Robin v. Espo Engineering Corp., 200 F.3d 1081, 1088 (7th Cir. 2000). If the plaintiff cannot present direct evidence to establish the discrimination claim, she may attempt to prove her case indirectly with circumstantial evidence using the familiar McDonnell Douglas burden-shifting method. See Krchnavy, 294 F.3d at 875 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973)).

The McDonnell Douglas method of proof entails three steps. See Robin, 200 F.3d at 1088. First, the plaintiff must establish a *prima facie* case of employment discrimination. See id. If the plaintiff successfully presents a *prima facie* case, a presumption of discrimination arises and the burden then shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for taking an adverse employment action against the plaintiff. See id. "[T]he plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Baron v. City of Highland Park, 195 F.3d 333, 339 (7th Cir. 1999) (citing Wilson v. AM Gen. Corp., 167 F.3d 1114, 1119-20 (7th Cir. 1999)).

In this case, Tovar offers no direct evidence of race or gender discrimination. As such, the court will analyze Tovar's Title VII claims under the McDonnell Douglas burden-shifting method. See Krchnavy, 294 F.3d at 875. To establish a *prima facie* case of race or gender discrimination under Title VII, Tovar must show that: (1) she was a member of the protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. See, e.g., Traylor v. Brown, 295 F.3d 783, 788 (7th Cir. 2002).

9

Tovar satisfies the first two elements of her *prima facie* case. She is a member of the protected class, as she is African-American and female. Additionally, although the City disputes that Tovar was meeting its legitimate job expectations, she has produced evidence showing that she was given satisfactory performance ratings throughout her employment with CPD. As such, viewing the record in the light most favorable, Tovar has satisfied the second element of her *prima facie* case for summary judgment purposes. Thus, the court's discussion of whether Tovar has established a *prima facie* case of employment discrimination under Title VII is limited to the last two factors within the <u>McDonnell Douglas</u> burden-shifting method. Therefore, for each discrete adverse employment action alleged, the court will determine whether Tovar has shown that she suffered an adverse employment action and whether similarly situated employees outside the protected class were treated more favorably.

**1. Administrative Positions in ARS**

Tovar asserts that the City's decision to deny her an administrative position within ARS was based upon her race and gender. Tovar fails to establish a *prima facie* case of employment discrimination on this issue for two reasons.

First, she cannot show that she suffered an adverse employment action as a result of the City's action. Although Tovar asserts that the administrative positions within ARS were generally more desirable than the call taker positions, she has not shown that the differences between the two positions were severe enough to establish an adverse employment action. The Seventh Circuit has established three categories of cases in which they have found materially adverse employment actions:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated;

(2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing [her] from using the skills in which [she] is trained and experienced; and

(3) 'cases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the conditions in which [s]he works are changed in a way that subjects [her] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace environment-an alteration that can fairly be characterized as objectively creating a hardship, the classic scase being that of the employee whose desk is moved into a closet.'

Tart v. Illinois Power Co., 366 F.3d 461, 475 (7th Cir. 2004) (quoting Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 744-45 (7th Cir. 2002)).

Tovar produces no evidence to support her position that the City's refusal to place her in an administrative position falls into any of these three categories of adverse employment actions. The evidence shows that call takers answer telephone calls, conduct investigations over the telephone, and write reports. These duties were not significantly different than those required of the administrative positions, which also involved answering telephone calls and completing reports. Officer Tovar received the same pay, benefits, and rank regardless of which position she filled. Additionally, all positions are sedentary and capable of being performed by officers on limited-duty status. Although due to the high volume of calls received the call taker position may be viewed as more stressful than the administrative positions, this difference alone is not enough to establish a materially adverse change in employment. See Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996) (stating that not every action which displeases an employee is actionable under Title VII). As such, Tovar has failed to establish the third element of her *prima facie* case. See Hill v. American General Finance, Inc., 218 F.3d 639, 645 (7th Cir. 2000) (finding that a failure to transfer to a lateral position is not an adverse employment action).

Second, Tovar has not established that other similarly situated employees were treated more favorably. She identifies three officers who were assigned to administrative positions-Officers Corcoran, Nytko and Foley. However, Tovar cannot dispute the City's evidence which shows that during this period, more than 30 officers who are African American, the majority of whom were women, had served in the administrative positions. Thus, Tovar fails to establish a *prima facie* case on her claim that the City discriminated against her by not placing her in an administrative position.

### 2. 911 Security Detail

Tovar asserts that the City's denial of her application to the 911 Securi ty detail in September 2001 was also based upon her race.[1] However, much like her claim based upon the City's refusal to place her in an administrative position, this claim fails because Tovar cannot show that she has suffered an adverse employment action or that similarly situated employees were treated more favorably.

Tovar provides no evidence to establish the working conditions at the 911 security detail; however, even if she had, it is not likely that the differences between the security position and the call taker position are significant enough to reach the level of a materially adverse employment condition which is actionable under Title VII. Both positions provide the same pay and benefits, are non-supervisory positions, and can be performed by officers assigned to limited-duty. Also, both are performed at the same time, during the second watch. Although Tovar would prefer to work on the 911 Security detail, her subjective belief alone is not enough

---

[1]Tovar admits that she does not believe she was refused a transfer to the 911 Security Detail because of her sex. See Pl.'s Response to Def.'s LR 56.1 Statement of Mat. Facts ¶ 66. Therefore, the court will only decide whether Tovar has established a *prima facie* case of racial discrimination as to this specific employment action.

to establish that the City's refusal to transfer her constitutes an adverse employment action. See Herrnreiter, 315 F.3d at 745 (finding no adverse employment action where a field investigator was reassigned to an inside auditing position despite his purely subjective preference for the investigation position); see also Hill, 218 F.3d at 645 (finding that a failure to transfer to a lateral position is not an adverse employment action).

Moreover, the City provides evidence which shows that Sergeant Mahon was not responsible for staffing the 911 Security positions. These positions are staffed by Commander Jerry Robinson (male, African-American), Deputy Director Steward (male, African-American), and Sergeant Bratek (male, Caucasian). Tovar claims that only Sergeant Mahon discriminated against her because of her race. To establish that Sergeant Mahon made the decision not to send her to the 911 Security detail, Tovar relies on a statement by Officer Braxton made to an Internal Affairs investigator. In his statement, Braxton stated that he heard rumors in the cafeteria that Sergeant Mahon said that Tovar was not to be assigned to the 911 Security detail. See Pl.'s Resp. to Def.'s LR 56.1 Stmt. of Mat. Facts ¶ 69. Such an unreliable statement based on a rumor is inadmissible hearsay, see Fed. R. Evid. 802, and also lacks the necessary foundation to show that it is based on Braxton's personal knowledge. See Fed. R. Evid. 602.

Tovar also cannot show that similarly situated employees were treated more favorably. Tovar admits that she does not know whether there were any available positions in the 911 Security detail when she applied. She also fails to provide evidence showing who obtained these positions when her application was denied. Further, Officer Braxton stated in his statement to IAD that at the time of her request, the makeup of officers in the 911 Security detail position was "about 50/50 of white and black officers." Pl.'s Resp. to Def.'s LR 56.1, Ex. 1, at 2. Thus, Tovar cannot show that other similarly situated non-African-American police officers were

treated more favorably. Therefore, Tovar fails to establish a *prima facie* case on her claim that the City discriminated against her by not placing her in a 911 Security detail position.

### 3. Proficiency Ratings

Tovar also alleges that Sergeant Mahon's decision to lower her proficiency ratings on at least two separate occasions was based upon her race and gender. Specifically, Tovar asserts that her performance ratings were unfair in that she received lower ratings than other non-African-American male officers despite the fact that she believes she was more productive. CPD had a policy which required supervisors to evaluate police officers on a semi-annual basis. The supervisor, usually the supervising sergeant, would complete a Proficiency Report giving the officer a rating between 0 and 100. A rating above 72 was considered acceptable and did not require substantial documentation; but a rating below 72 did require substantial documentation because it would prevent the officer from receiving a pay raise. The supervisor who signs the Proficiency Report is the person who presents the officer with the rating. Proficiency ratings are no longer performed within CPD.

Initially, Tovar's claim fails because she has not produced evidence of when these actions involving lower proficiency ratings occurred. She admits that she cannot recall the specific dates or general time periods for which she received the lower ratings. Therefore, she has failed to show that these actions fell within the 300-day limitation period. Additionally, Tovar cannot show that any proficiency rating she received from Sergeant Mahon constituted a materially adverse employment action. Tovar only recalls one period in which she received a rating of 85. This rating is well above the score of 72 which would have prevented her from receiving a pay raise. Absent an appreciable diminution in employment status, Tovar's lower efficiency rating does not constitute an adverse employment action. See <u>Oest v. Illinois Dep't of</u>

Corrections, 240 F.3d 605, 613 (7th Cir. 2001) (finding that unfavorable performance evaluations alone do not constitute adverse employment actions); see also Silk v. City of Chicago, 194 F.3d 788, 801-03 (7th Cir. 1999) (same).

Moreover, Tovar has not shown that similarly situated non-African-American or male police officers were treated more favorably. She only identifies one instance in which a non-African-American male call taker received a more favorable performance evaluation. In her deposition, Tovar stated that Officer Banks (male, Caucasian) received a 93 on his proficiency rating, while she only received an 85. Although Tovar claims that she did many more case reports than Officer Banks during this period, she provides no evidence of the other factors which are considered in a performance evaluation. As such, Tovar is unable to show that their respective ratings were undeserved. Tovar fails to show that there is a genuine issue of material fact as to why her proficiency rating was lower than Officer Banks. As such, she cannot establish a *prima facie* case of employment discrimination as to this issue.

### 4. Telephone Call to Tovar's Home while on Maternity Leave

Finally, Tovar claims that Sergeant Mahon's telephone call to her at home while she was on maternity leave was based upon her race. In 2001, Sergeant Mahon was assigned to investigate a CR number in which a citizen accused Tovar of failing to complete a case report. Because Sergeant Mahon was required to interview Tovar personally, he telephoned the CPD Medical Section to determine her medical roll status. Sergeant Mahon then telephoned Tovar at home to determine when she was coming back to work. After Tovar informed Sergeant Mahon that she was placed on bed rest by her doctor, Sergeant Mahon advised her to notify the Medical Section to change her medical roll status. Except for this telephone call, Sergeant Mahon took no further action to interview Tovar while she was on maternity leave.

Tovar's claim fails for two reasons. First, a telephone call to an employee's home to inquire on her work status does not constitute a tangible job consequence actionable under Title VII. See Oest, 240 F.3d at 612-13 (stating that material adverse actions must be more than a mere inconvenience). Second, Tovar produces no evidence of any non-African-American or male police officers who were treated more favorably. She cannot rebut Sergeant Mahon's testimony that there were no other circumstances where he was assigned to investigate a CR number involving another officer who was on pregnancy or medical leave. As such, Tovar's disparate treatment claim regarding Sergeant Mahon's telephone call fails.

## B. Retaliation

Next, Tovar alleges that Sergeant Mahon retaliated against her for filing an internal complaint of discrimination against him on November 7, 2001. According to her complaint, Tovar alleges that after she filed the internal complaint of discrimination, she was subjected to "open hostility, verbal abuse, embarrassment, and offense [sic.] conduct." Pl.'s Second Am. Compl., ¶ 10. Specifically, Tovar alleges that Sergeant Mahon spoke to her in a derogatory manner on more than one occasion.

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. See 42 U.S.C. § 2000e-3(a). As with other Title VII claims, a plaintiff seeking to prove such a violation may present either direct or indirect evidence of the employer's intent. See Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002). Tovar seeks to establish her claim by the indirect burden-shifting method.

Under the indirect methodology, Tovar must first present evidence sufficient to establish a *prima facie* case that the City retaliated against her in violation of Title VII. See id. In this case, a *prima facie* case is established if Tovar can demonstrate that: (1) she engaged in statutorily protected activity; (2) she performed her job according to the City's legitimate expectations; (3) despite meeting the City's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. See id.; see also Stone v. City of Indianapolis Pub. Util. Div., 281 F.3d 640, 644 (7th Cir. 2002). If Tovar fails to establish any element of the *prima facie* case, her retaliation claim fails and cannot survive summary judgment. See id.

Tovar alleges that just two days after she filed the internal complaint, she was talking to Officer Braxton at his workstation when Sergeant Mahon approached, started yelling at her and instructed her that she could not leave her seat. Tovar also indicates that Officer Braxton was present and witnessed this exchange. Officer Braxton's account of this exchange is instructive with regard to Tovar's claim of retaliation. In his deposition testimony, Officer Braxton stated that Sergeant Mahon informed Tovar that she was supposed to be at her workstation, stating: "You are not supposed to be over here. I expect you to be at your workstation working." Def.'s Local 56.1(a) Statement of Undisputed Material Facts, Braxton Dep. at 29. When Officer Braxton was questioned with respect to what occurred and Sergeant Mahon's demeanor, the following dialogue took place:

> Counsel for City: Okay. Sergeant Mahon, did he yell at Officer Tovar?
> Off. Braxton: No, no.
> Counsel for City: Did he say anything else that you can recall?
> Off. Braxton: No.

Id. at 29-30. Beyond this November 9, 2001 exchange, Tovar presents no evidence of any other instances of allegedly retaliatory conduct.

Retaliatory harassment by co-workers or a supervisor can rise to the level of a materially adverse employment action if it is severe enough to cause a significant change in the plaintiff's employment status. See Stutler v. Illinois Dept. of Corrections, 263 F.3d 698, 703 (7th Cir 2001). However, the single isolated exchange relied upon by Tovar to support her claim of retaliation did not cause a significant change in her employment status. Compare Knox v. Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996) (upholding a jury verdict in favor of a plaintiff whose co-workers embarked on a campaign of vicious gossip and profanity aimed at making "her life hell" in response to her complaints that a supervisor sexually harassed her). Such a trivial exchange, as indicated by the deposition testimony of Officer Braxton, cannot establish any adverse employment action, and Tovar's claim fails as a matter of law.

## C. Hostile Work Environment

Lastly, Tovar alleges that while she was detailed to ARS, she was subjected to a hostile work environment in violation of Title VII. Tovar asserts that upon being assigned to ARS in 1996, while she was under the command of Sergeant Mahon and Sergeant Bratek, she endured a racially hostile and abusive work environment. Specifically, Tovar claims that she was treated less favorably than other non-African-American officers, often by being addressed in a humiliating manner and denied favorable work assignments. Tovar further claims that Sergeant Mahon repeatedly supervised her work performance more closely than he supervised other non-African-American officers.

To establish a hostile work environment based on race, and survive a motion for summary judgment, Tovar must show: (1) she was subject to unwelcome harassment; (2) the

harassment was based on her race; (3) the harassment was so severe or pervasive as to alter the conditions of her working environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. See Williams v. Waste Management of Illinois, Inc., 361 F.3d 1021, 1029 (7th Cir. 2004). The abusive working environment must qualify both subjectively and objectively. See Silk, 194 F.3d at 788. An objective hostile work environment is one that a reasonable person would find hostile and abusive. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). In short, the plaintiff must show that her work environment was "hellish." See Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003).

When considering these issues, the court may look at conduct beyond that which falls within the relevant statutory period, provided that at least one act contributing to the claim occurs within the filing period. See Nat'l. R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). Because the very nature of a hostile work environment claims involve repeated instances of conduct, thus making them different in kind from discrete acts, a single act of harassment may not be actionable on its own. See id. at 115-117. However, when combined with a series of acts occurring over a period of time, the cumulative effect of these actions may constitute one unlawful employment practice. See id. at 117 (citing Harris, 510 U.S. at 21).

In this case, the City objects to Tovar producing evidence of discrimination going beyond the 300-day limitation period set by Title VII. However, Tovar has identified various discrete acts which fall within this period. As such, for purposes of deciding whether the City is entitled to summary judgment on Tovar's hostile work environment claim, the court may consider all of the conduct that Tovar alleges encompasses the racially hostile work environment, including any conduct going dating back to 1996. See Morgan, 536 U.S. at 118. However, Tovar has provided no admissible evidence of any acts which occurred prior to the 300-day period.

In an attempt to support her hostile work environment claim, Tovar reiterates all of her claimed discrete acts of discrimination and further asserts that she endured a racially hostile and abusive work environment manifested by disparate treatment with respect to discipline and work assignments. Specifically, Tovar claims that she was treated less favorably than other non-African-American officers, often by being addressed in a humiliating manner and denied favorable work assignments. Tovar further claims that Sergeant Mahon repeatedly supervised her work performance more closely than he supervised other non-African-American officers. Additionally, Tovar asserts that African-American officers in general were treated less favorably than other officers. As discussed above, much of the evidence Tovar cites in support of her position consists of general conclusory allegations. Tovar provides no details of the statements, instead discussing the issue in broad generalities. Further, Tovar does not provide dates or even a time frame of when many of the statements occurred. It is well-settled that "conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." Lucas v. Chicago Transit Authority, 367 F.3d 714, 726 (7th Cir. 2004) (citing Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001)). In sum, there is simply no evidence from which a reasonable jury could conclude that the City subjected Tovar to a hostile work environment. Accordingly, summary judgment is granted as to Tovar's hostile work environment claim.

## IV. CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 8/27/04